# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

THERESA VARGO,               )        CASE NO. 4:09CV2304
                             )
            PLAINTIFF,       )        JUDGE SARA LIOI
                             )
vs.                          )
                             )
STATE AUTO MUTUAL INSURANCE  )        **MEMORANDUM OPINION**
COMPANY,                     )
                             )
            DEFENDANT.       )
                             )

Before the Court is defendant's motion for summary judgment (Doc. No. 27, supported by Doc. No. 28), plaintiff's memorandum in opposition (Doc. No. 30)[1] and defendant's reply (Doc. No. 34). For the reasons discussed below, the motion is **GRANTED**.

## I.  BACKGROUND

Plaintiff Theresa Vargo ("Mrs. Vargo" or "insured") filed a complaint in the Trumbull County Court of Common Pleas alleging that defendant State Auto Mutual Insurance Company ("State Auto" or "insurer") breached a contract of insurance and acted in bad faith, entitling her to damages, including punitive damages. State Auto timely removed the action to this Court.

Mrs. Vargo[2] maintained a residence in Hubbard, Ohio which was insured under a homeowner's policy issued by State Auto. A water leak occurred in the home in late summer

---

[1] Plaintiff also submitted an Affidavit of Robert Thompson (Doc. No. 33) purportedly in support of her opposition to the summary judgment motion.

[2] Mrs. Vargo suffers from dementia, which was diagnosed some time in the spring of 2007. (Thomas Vargo Deposition ("Vargo Dep.") at 11-12.)

2007 while Mrs. Vargo and her son, Thomas Vargo ("Vargo"), were in Mrs. Vargo's winter home in Florida.[3] The leak caused significant water damage to the first floor and basement and, because some time elapsed before it was discovered by a neighbor, there was also mold damage.

When Vargo learned of the damage to Mrs. Vargo's home, he called her insurance agent, Robert Thompson, and asked him to go to the house and check. Thompson confirmed that there was a "[v]ery substantial amount of water damage." (Thompson Dep. at 19.) He "set quite a few heaters up within the home and fans" and called in a contractor "to start remediating[.]" (*Id*.)

Vargo immediately gave notice to State Auto that the insured would be submitting a claim. State Auto assigned an adjuster, Jim Puster, who visited the home and determined that there was only mold damage and that State Auto would pay $10,000. (Thompson Dep. at 20-21.) Thompson's office called Puster to insist that there was a claim for water damage. (*Id*. at 21.)

Thereafter, State Auto assigned another adjuster, John Arter ("Arter"), who verified that this was a water claim. By the time Arter got involved, the mold had already been remediated (Arter Dep. at 11) and State Auto had paid for "the initial dry out" and for "mold remediation." (Vargo Dep. at 35, 39.) A company called United Building Maintenance ("UBM") was then engaged by Vargo to help him make the insurance claim on his mother's behalf. (Vargo

---

[3] Mrs. Vargo and her now-deceased husband had maintained a winter home in Florida since around 1985. (Vargo Dep. at 11, 13-14.) It was their practice to leave Ohio for Florida between Christmas and New Year's and return around the end of April or beginning of May. (*Id*. at 14.) She continued this practice after her husband died in September 1989. (*Id*. at 15.) At the time the leak occurred in September 2007, she was already in Florida, having gone down in June in hopes of learning whether she could withstand the summer heat if she and her son were to move to Florida permanently. Vargo was suffering from cancer and the prognosis for recovery was not good; he felt somewhat better in warmer climates. Mrs. Vargo, who was already suffering from dementia, wished to be with him in what they thought were his final years. (*Id*. at 15-16; 25.) The plan was to return to Ohio around Labor Day in 2007, but Vargo was notified of a problem by their security company, which prompted him to ask a neighbor to check. When the water damage was discovered, they never returned to Ohio, realizing that the Hubbard home was unlivable at the time. (*Id*. at 19.)

2

Dep. at 35.)[4] Because the moldy contents presented a danger to Vargo's health and because Mrs. Vargo was no longer capable of assisting, Arter recommended that UBM complete the contents inventory. (Vargo Dep. at 44.) Arter provided a "contents inventory" form, which Vargo gave to UBM. (*Id*. at 45; Def. Exh. D, Doc. No. 28-15; Arter Dep. at 14.) This inventory form had columns headed as: description of articles; where purchased; date acquired; original cost; and cost now. The form listed September 4, 2007 as the loss date. Vargo testified that he heard Jim Dobson, from UBM, ask Arter if he would require the use of the contents inventory form he had supplied because Dobson preferred to use UBM's own spreadsheet which could then be e-mailed to Arter. Arter approved that method, according to Vargo. (Vargo Dep. at 46.) Arter disputes this, indicating that he has no recollection of any such request by UBM or Vargo. (Arter Dep. at 16.)

Arter eventually received an initial contents inventory of sorts. He could not recall exactly when he received it. (Arter Dep. at 16.)[5] This inventory was a spreadsheet of over 100 pages; it did not contain "cost factors as to cost to clean or repair or replace." (Arter Dep. at 17.) There were no ages listed for the contents, which Arter described as "critical." (*Id*.) As a result, Arter considered the inventory "totally useless." (*Id.*) In a letter dated July 11, 2008, Arter outlined his problems with the inventory, indicating that it had been received "[s]ome time ago." (Doc. No. 28-21.) He stated that, because the inventory was "vague," he had been "unable to

---

[4] Vargo testified that Thompson initially engaged Morocco Services to clean up the water and mold. (Vargo Dep. at 32, 105.) Morocco moved all the contents out of the house and put them in storage containers in the driveway. (*Id.* at 39.) Eventually, Vargo was dissatisfied with Morocco and hired UBM to help with the contents inventory and with cleaning and restoration services. (*Id.* at 36.) Vargo subsequently replaced UBM with Mark IV Builders. (*See*, Doc. No. 28-16.)

[5] In a letter from Arter to Vargo dated December 31, 2007, wherein Arter explained his computation of the actual cash value for structural damage, he indicated that he had "not received the inventory of non-salvageable items nor any repair/cleaning estimates for salvageable items." (Doc. No. 28-17.) In another letter dated January 24, 2008, Arter indicated once again that he had not received the inventory and that he needed it, along with estimates for repair and cleaning, before he could give any consideration to personal property loss. (Doc. No. 28-18.)

determine what items were damaged beyond repair and what items were salvageable by virtue of cleaning." (*Id.*) He reminded Vargo that he had previously furnished State Auto's personal property inventory forms. He stated:

> Regarding the inventory, what we need is simple. We need an inventory of the totally damaged items on which a description of the item is furnished along with the age and approximate replacement cost. Each page of the inventory needs to be signed by [Mrs. Vargo] as the named insured. We also need the actual cleaning costs for the items which are salvageable. Ultimate Building Maintenance may have the cleaning figures as they had submitted an invoice in the amount of $5,781.05 representing their charge for packing, inventorying, and cleaning items.
>
> We would sincerely like to move adjustment of this loss along to conclusion and ask that you advise us as to the status of the dwelling repair and to submit the personal property inventory and cleaning charges incurred. [. . .]

(*Id.*) At his deposition, Arter acknowledged that the form of the inventory was not that important to him; had the UBM spreadsheet contained the necessary information, he could have worked with it. (Arter Dep. at 18.)

Vargo and Arter agree that a final inventory was supplied in December of 2008 by Mark IV Builders, which had replaced UBM in May 2008. (Vargo Dep. at 64; Doc. No. 28-16; Arter Dep. at 19.) At that time, Arter was very involved with adjusting claims from a recent ice storm and he told Vargo that he needed a little more time to complete his work. (*Id.*) Apparently the forms submitted were e-mailed to Arter and did not contain the insured's signature on each page. He denies ever telling Vargo that the signatures were not required. (*Id.*) In any event, Arter believed he had enough to work with and, given that no ages had been supplied for any of the personal property, he planned to "apply what in the industry is standard maximum depreciation of 75 percent[.]" (*Id.* at 22.)

Thompson claims that he had a conversation with Arter in May or June of 2009 during which Arter indicated that checks for the personal property would be issued shortly.

(Thompson Dep. at 31-32.) Arter denies ever making such a statement simply because he had no check-writing authority. (Arter Dep. at 20.) In any event, before Arter could ever submit his recommendations to State Auto, the file was removed from him and assigned to a third adjuster, Marlene Butts ("Ms. Butts") of Integrity Claims Solutions, LLC. (*Id*. at 22; Butts Dep. at 18.) Arter believes this happened in May or June of 2009 and that it was due to "lack of activity." (Arter Dep. at 23, 24.)

When Ms. Butts took over the file, she received it in hard copy from Arter. (Butts Dep. at 16.) It was "three inches, four inches" thick. (*Id.*) The personal property inventory in the file was only 25 or 30 pages. (*Id*. at 17.) In a letter to Vargo dated June 28, 2009, Ms. Butts included the contents inventory and directed that Mrs. Vargo had to sign and date each page and "provide a date of purchase for each item and the cost to replace each item at today's cost for a comparable item." (Doc. No. 28-24.) Upon receipt of that letter, Vargo realized that Ms. Butts was not dealing with the full inventory, so he contacted her by phone. She asked him to send the complete document to her. (Vargo Dep. at 76-77; Butts Dep. at 26.)  By e-mail dated July 16, 2009, Ms. Butts notified Vargo that she had not yet received the hard copy contents inventory. (Doc. No. 28-22.) She reminded Vargo that the loss claim "must be complete before September 4, 2009." (*Id.*)[6] She stated: "Review of the list is a time consuming process. The sooner I receive it, the sooner I can complete the computations that must take place for each item." (*Id*.)

Some time after that, Ms. Butts did receive the full inventory with each page signed by Mrs. Vargo. (Butts Dep. at 27.) She noted that there were no ages indicated for any of the items and evaluation of loss is "very dependent on the age of the item." (*Id*. at 30.) Having no ages to go by, she simply applied the maximum 60% depreciation to compute the actual cash

---

[6] This two-year requirement was contained in the insurance contract.

5

value of items which she believed had been lost and then evaluated cleaning costs for salvageable items. (*Id*.)[7]

Ms. Butts communicated the results of her evaluation in writing to Vargo. The cover letter was dated June 28, 2009, but she testified at her deposition that this was a mistake; she had used an earlier letter as a template and neglected to change the date. (Butts Dep. at 39; Doc. No. 28-23.) Although she did not recall when she had sent this for Vargo's review and approval, Vargo had an express mail envelope from her dated August 24, 2009 and he testified that he received Ms. Butts's valuation with "like a week to go" before the statute of limitations expired. (Butts Dep. at 40; Vargo Dep. at 84.) In addition, Mrs. Vargo's signature on each of the inventory sheets is over a date of July 18, 2009. (Butts Dep. at 49.) Therefore, it seems that Ms. Butts received the final inventory some time after July 18, 2009 and returned her estimate to Vargo by August 24, 2009.

In her incorrectly-dated communiqué, Ms. Butts noted that it was impossible to determine actual cash value without ages of the items and that she had simply applied the maximum depreciation. She indicated that there could be recomputation if ages were provided. She further stated that, after items were replaced, a Replacement Cost Claim for the difference between replacement cost and actual cash value could be made. She reminded Vargo, however, that the claim must be completed by September 4, 2009. (Doc. No. 28-23.) Ms. Butts also asked that Mrs. Vargo sign and return an "Ohio Fraud Warning" form, as required by law, in order for the claim to be paid. (*Id*.)

---

[7] The Court notes that Arter and Ms. Butts had differing views as to the maximum depreciation that was standard in the industry for computing actual cash value. Arter quoted it as 75%, whereas Ms. Butts used 60%.

Vargo was very dissatisfied with the recommendation of Ms. Butts, which would have awarded only about $20,000 in actual cash value for property which Vargo valued at around $56,000. He had also requested a cash advance so that he could replace the articles, in order to claim the replacement value, and, not having received any advance, he believed it was impossible to remedy the situation in the little time remaining before the statute of limitations ran. (Vargo Dep. at 77-79.) Unbeknownst to Vargo, Ms. Butts, attempting to expedite the claim, had already received the check and was ready to send it upon receipt of the signed Ohio Fraud Warning form. However, Vargo never sent the form; he simply hired a lawyer and filed this lawsuit so as not to let his mother's claim be time-barred. At one of the early case conferences, it became clear that Ms. Butts had the check and was waiting for the signed form before issuing it. That matter has since been resolved and Vargo now acknowledges that he received the check for the actual cash value amount. (Vargo Dep. at 84-85.)

When asked at his deposition what he claims is still owed, he stated that he wanted the difference between the total claim of $56,415.37 and the actual cash value of $20,377.38 that Mrs. Vargo already received. (Vargo Dep. at 87; Butts Dep. at 51.) He could not, however, confirm that items had been replaced and that, if they had been, there were receipts to prove it. (Vargo Dep. at 88.) He also stated that no one at State Auto had ever told him that he actually had to replace the items within two years after the loss date in order to recover replacement cost. (*Id*. at 90.) However, his own agent, Thompson, testified that he had told Vargo of the need for replacement and that Vargo "wasn't certain how he was going to be able to start paying to replace the items[.]" (Thompson Dep. at 35.) Vargo's own testimony also supports that. (Vargo Dep. at 72.)

Besides claiming entitlement to additional monies for the property damage, Vargo also claims "additional living expenses" under the contract as well as punitive damages for bad faith handling of the claim.

## II. SUMMARY JUDGMENT STANDARD

Effective December 1, 2010,[8] Rule 56 of the Federal Rules of Civil Procedure, addressing Summary Judgment, provides in relevant part as follows:

(a) **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

[ * * * ]

(c) **Procedures.**

  (1) *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[8] All of the briefs relating to the instant motion were filed before the effective date of the new Rule 56. However, that should have no bearing on resolution of this motion because the Committee Notes accompanying the new rule make clear that it was "revised to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts." The fundamental standard for deciding these motions "remains unchanged." There still must be "no genuine dispute as to any material fact" and the movant must be "entitled to judgment as a matter of law." As noted by the Committee: "The amendment will not affect the continuing development of the decisional law construing and applying these phrases."

**(2)**    ***Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3)**    ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

**(4)**    ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

[* * *]

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on

which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## III. DISCUSSION

State Auto seeks summary judgment on all of Mrs. Vargo's claims: breach of contract, bad faith, and punitive damages.

Analysis of a claimed breach of an insurance contract is governed by familiar principles.

> "An insurance policy is a contract whose interpretation is a matter of law. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus. Contract terms are to be given their plain and ordinary meaning. *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167-168, 24 O.O.3d 274, 436 N.E.2d 1347. If provisions are susceptible of more than one interpretation, they 'will be construed strictly against the insurer and liberally in favor of the insured.' *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus. [. . .]" *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St. 3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 6.
>
> Although ambiguous provisions in an insurance policy must be construed strictly against the insurer and liberally in favor of the insured, *see, e.g.*, *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus, it is equally well settled that a court cannot create ambiguity in a contract where there is none. *See, e.g.*, *Hacker v. Dickman* (1996), 75 Ohio St.3d 118, 119, 661 N.E.2d 1005. Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation. *Id*. at 119-120, 661 N.E.2d 1005.

*Lager v. Miller-Gonzalez*, 120 Ohio St. 3d 47, 49-50 (2008).

To resolve this claim, therefore, the Court must look to the terms of the insurance contract, a copy of which was attached to the summary judgment motion as Exh. C. (Doc. No. 27-4.)

10

**A.** **Claim for Lost Property**

It is undisputed that this was a "replacement cost policy." Plaintiff complains that, despite her compliance with "all the requirements of [her] policy" (Opp'n at 7), defendant paid her claim on an "actual cash value" basis rather than a replacement cost basis. As discussed below, there is no doubt that actual cash value was paid; however, this is the best plaintiff could expect, given her complete failure to comply with all the policy terms with respect to making a replacement cost claim.

The State Auto policy provides, in relevant part, as follows:

**SECTION I – PROPERTY COVERAGES**

A.      **Coverage C–Personal Property**
        1.      **Covered Property**
        We cover personal property owned or used by an "insured" while it is anywhere in the world. After a loss and at your request, we will cover personal property owned by:
                a.      Others while the property is on the part of the "residence premises" occupied by an "insured"; [***]

**SECTION I – CONDITIONS**
[***]
B.      **Duties After Loss**
        In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either:
        1.      Give prompt notice to us or our agent;
        2.      Notify the police in case of loss by theft;
        3.      Notify the credit card or electronic fund transfer card or access device  company case of loss as provided for in **E.6**. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Overages;
        4.      Protect the property from further damage. If repairs to the property are required, you must:
                a.      Make reasonable and necessary repairs to protect the property; and
                b.      Keep an accurate record of repair expenses;
        5.      Cooperate with us in the investigation of a claim;

6.     Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

7.     As often as we reasonably require:
    a.    Show the damaged property;
    b.    Provide us with records and documents we request and permit us to make copies; and
    c.    Submit to examination under oath, while not in the presence of another "insured", and sign the same;

8.     Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
    a.    The time and cause of loss;
    b.    The interests of all "insured" and all others in the property involved and all liens on the property;
    c.    Other insurance which may cover the loss;
    d.    Changes in title or occupancy of the property during the term of the policy;
    e.    Specifications of damaged buildings and detailed repair estimates;
    f.    The inventory of damaged personal property described in **6**. above;
    g.    Receipts for additional living expenses incurred and records that support the fair rental value loss; and
    h.    Evidence or affidavit that supports a claim under **E.6**. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money under Section **I** – Property Coverages, stating the amount and cause of loss.

(Form HO0003, Doc. No. 27-4 at 24, 32-33.) An endorsement to the policy further provided as follows:

**PART F–REPLACEMENT COST COVERAGE–PERSONAL PROPERTY**
Loss Settlement provision **C.1.a.** and **b.** is replaced by the following:

**A.**     **Eligible Property**
1.     Covered losses to the following property are settled at replacement cost at the time of the loss:
    a.    Coverage C. Personal Property;

[***]

12

    **C.**    **Replacement Cost Loss Settlement Condition**
    The following loss settlement condition applies to all property described in
    **A.** above:
    1.    We will pay no more than the least of the following amounts:
        a.    Replacement cost at the time of loss of the following
            without deduction for depreciation;
        b.    The full cost of repair at the time of loss;
        c.    The limit of liability that applies to Coverage **C**, if
            applicable;
        d.    Any applicable special limits of liability stated in this
            policy; or
        e.    For loss to any items described in **A.2.a – i**. above, the limit
            of liability that applies to the item.
    2.    If the cost to repair or replace the property described in **A.** above is
        more than $500, we will pay no more than the actual cash value for
        the loss until the actual repair or replacement is complete.
    3.    You may make a claim for loss on an actual cash basis and then
        make claim for any additional liability in accordance with this
        endorsement provided you notify us of your intent to do so within
        180 days after the date of loss.

    All other provisions of this policy apply.

(Form FI270, Doc. No. 27-4 at 13-14.)

These provisions make clear that personal property loss over $500 is paid at actual cash value (which takes depreciation into account) until such property is replaced or repaired and a replacement loss claim is made, provided notice of intent to do so is given within 180 days of the date of loss. Here, there is no question that Mrs. Vargo never made a replacement loss claim and, for that matter, never provided the ages of her lost items so that more tailored depreciation amounts, as opposed to the standard maximum depreciation, could be applied to the actual cash value claim. It is also clear that both Arter and Ms. Butts made clear that this was information they needed. (*See e.g.,* Doc. No. 28-21; Doc. No. 28-24.) Since they never received the information, State Auto had no choice but to offer the actual cash value, less the maximum depreciation. Even so, Ms. Butts made clear that she was still open to further

adjustments should Vargo supply the ages and proof of replacement costs within the two-year limitations period. (*See* Doc. No. 28-23.)

Plaintiff does not adequately address defendant's arguments relating to the actual contract provisions. She makes assertions, such as: she "purchased and paid for what was described as the 'Cadillac of Policies,' a replacement cost policy" (Opp'n at 6); the three adjusters "handled the claim as an actual cash value policy" (*id*. at 6-7); the requirement of age and purchase price "did not apply to the replacement cost policy" (*id*. at 7); Ms. Butts "applied the maximum depreciation schedule of a 60% reduction to every item listed despite its age or condition" (*id*.); "neither adjuster provided any [funds] to the Vargos's [sic] to replace their loss despite the fact that they had a replacement cost policy" (*id*.); "[f]rom September 4, 2007 until August 28, 2009 no offers of any nature were given to the Vargos despite their meeting all the requirements of their policy" (*id*.); Ms Butts's "position of age and cost for depreciation had no place in adjusting this claim since it was a replacement cost policy and the Vargos had made it clear to both [Ms.] Butts and Arter of their intent to replace the damaged contents" (*id.* at 8); and "[t]he choice as to the use of actual cash value or the pursuit of replacement cost belongs to the insured and not the carrier pursuant to Part F(C)(3) of the Vargo Policy" (*id.*).

While some of these assertions are true and others would have merit had the insured actually replaced any of the items and made a replacement cost claim, they are simply not relevant under the facts as presented by the record of this case. The terms of the policy are clear: actual cash value, less depreciation, is paid until a properly-supported replacement cost claim is made, provided that is completed within the two-year time limit.

Mrs. Vargo's assertion that defendant was somehow at fault for failing to advance any monies has no merit whatsoever, in view of the fact that there is no provision in the policy

14

for any advance. She is possibly inartfully arguing that a more timely payment of actual cash value would have constituted an "advance" that she could have used to pay for the replacements and then make a replacement claim. This argument, to the extent it is being made, must also fail. Even while Arter was still assigned to the claim, since Mrs. Vargo had not yet made a replacement cost claim, he could only treat the claim as one for actual cash value, which required that she either supply the ages and original costs of each item or settle for a computation based on the maximum depreciation. She did not supply the ages and costs, despite Arter's request for that information. (Arter Dep. at 22.) Therefore, had Arter remained on the claim, he planned to apply a 75% depreciation, which he described as the industry's "standard maximum depreciation." (*Id*.) After Ms. Butts took over, Mrs. Vargo still never supplied the missing information. (Butts Dep. at 29, 30.) To Mrs. Vargo's ultimate advantage, Ms. Butts applied only a 60% depreciation. (*Id*. at 30.) Ms. Butts was also prepared to issue the check for the actual cash value but was holding it for the signed Ohio Fraud Warning that was required but had not been supplied by Mrs. Vargo.

Defendant is entitled to summary judgment with respect to any claim for breach of insurance contract relating to property loss.

**B.     Claim for "Additional Living Expenses"**

Plaintiff claims that she is entitled to recover for additional living expenses to cover alleged expenses incurred by her son in traveling from Florida to assist with the claim. The complaint does not identify precisely what additional expenses she claims entitlement to and the record does not reflect any such expenses that would be authorized under the insurance policy.

The State Auto policy provides, in relevant part:

15

**Part D -- Loss of Use**
The limit of liability for Coverage D is the total limit for all the coverages that follow.

1.    If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following. However, is the "residence premises" is not your principal place of residence, we will not provide the option under paragraph **b.** below.

    a.    **Additional Living Expense**, meaning any necessery increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

    b.    **Fair Rental Value**, meaning the fair rental value of that part of the "residence premises" where you reside less any expenses that do not continue while the premises is not fit to live in.

Payment under **a.** or **b.** will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

(FI270, Doc. No. 27-4 at 11.) "Residence premises" is defined as "[t]he one family dwelling where you reside; [. . .] and which is shown as the 'residence premises' in the Declarations." (Form HO0003, Doc. No. 27-4 at 23). The residence premises listed in the Declarations is 3235 Roseview Avenue, S.E., Trumbull County, Hubbard, OH 44425. (Doc. No. 27-4 at 4.)

At the time of the loss, Mrs. Vargo (and her son) were residing at a home she owned in South Daytona Beach, Florida, and she was preparing to move to a home in Port Orange, Florida which was owned by a family trust. (Vargo Dep. at 7, 20, 21, 26.) Aside from the fact that the Ohio home that suffered the loss was still in her name, there is no evidence that she ever intended to return there to live because she was "contemplating a permanent move to Florida[.]" (*Id.* at 16.) Under this scenario, the Ohio premises were not the "residence premises" as defined in the policy.

Vargo contends that he incurred additional costs travelling back and forth between Florida and Ohio during the time the claim was being adjusted. However, even though he claims to have had Mrs. Vargo's power of attorney,[9] there is no evidence that expenses he incurred, if any, were ultimately re-paid by Mrs. Vargo. She was the sole named insured under the State Auto insurance policy and only she was entitled to recover additional living expenses. Even if Vargo were entitled to recover under the policy, there is no evidence of any expenses incurred by him. He drove an RV between Florida and Ohio and stayed in it while it was parked at a friend's business in Ohio. His friend did not charge him any rent or utilities. (Vargo Dep. at 95, 110.) There is no evidence as to the exact number of trips Vargo made to Ohio and his best recollection is four to six times. (*Id*. at 31, 111.) An insurer cannot be expected to pay on a mere estimation of vaguely-defined costs.

Vargo claims that Mrs. Vargo would have returned to Ohio in September and stayed there until again going to Florida for the winter, as was her long-time custom. He believes that entitles them to recover all of the costs for the Florida residence. An exhibit referenced at Vargo's deposition (*see* Doc. No. 28-13) shows the utilities and other regular monthly expenses for the Florida home; but there is no similar document for the Ohio home. Had this proof been supplied, it is possible that Mrs. Vargo *might*[10] have been able to recover a few month's of Florida expenses that were proven to *exceed* what her Ohio expenses would have been. But there was no such evidence supplied.

---

[9] There is no copy of any written power of attorney in the record.

[10] The only way she could arguably recover for these few months would be to make the claim that, because her Ohio home was unfit to reside in, she was unable to return to Ohio for the months of September, October, November and December (which would have been her plan) and was forced to stay in Florida. This, however, would not overcome State Auto's fundamental argument that she simply cannot recover additional costs because the home that was damaged was not the "residence premises."

Defendant is entitled to summary judgment with respect to any claim that the insurance policy was breached by its refusal to pay any additional living expenses.

**C.      Bad Faith and Punitive Damages Claims**

"Based upon the relationship between an insurer and its insured, an insurer has the duty to act in good faith in the handling and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort against the insurer." *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St. 3d 272 (1983), Syllabus ¶ 1 (following and extending *Hart v. Mutual Ins. Co.,* 152 Ohio St. 185 (1949)). "Punitive damages may be recovered against an insurer who breaches his duty of good faith in refusing to pay a claim of its insured upon proof of actual malice, fraud or insult on the part of the insurer." *Id.*, Syllabus ¶ 2 (applying *Columbus Finance v. Howard,* 42 Ohio St. 2d 178 (1975)). "'[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.'" *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 554-55 (1994) (quoting *Staff Builders, Inc. v. Armstrong*, 37 Ohio St. 3d 298 (1988)). Although the mere refusal to pay insurance benefits does not constitute bad faith, *Hoskins*, 6 Ohio St. 3d at 1320, "bad faith in the adjustment of an insurance claim may exist without a valid claim for coverage[.]" *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 Fed. Appx. 495, 501 (6th Cir. 2007). However, to recover on a bad faith claim relating to delay, "an insured must put forth evidence that the claim was [. . .] unreasonably delayed and the insurer had no justification for such [. . .] delay." *Price v. Dillon*, Nos. 07-MA-75, 07-MA-76, 2008 WL 698944, at * 5 (Ohio Ct. App. March 13, 2008) (internal quotation omitted).

In this case, State Auto did not act in bad faith by refusing to pay the replacement cost coverage since plaintiff did not supply the information required by the insurance contract. State Auto paid the actual cash value, which is all it could pay given the information plaintiff provided, and it did that within two months of receiving the signed, completed inventory of lost property.

Plaintiff seems to argue that she was prohibited from fulfilling her duties under the insurance contract by a combination of the ill health of herself and her son (who was helping her with her claim); the changes in adjusters and their varying personal preferences and requirements with respect to the procedure for making claims; and the fact that they finally made an offer a mere week before the statute of limitations on the claim ran. She asserts that this amounts to bad faith.

Although it is most unfortunate that both Mrs. Vargo and her son were struggling with health issues at the relevant time, this does not excuse Mrs. Vargo's performance under the contract. To recover under the contract, she needed to supply a list of all lost property, the age of each, and its initial cost. This inventory needed to be signed and had to contain the necessary Ohio Fraud Warning. Further, if she wished to recover replacement costs, she needed to supply proof of replacement. No replacement claim was ever made and, therefore, actual cash value, less the maximum depreciation (because no ages and initial costs were supplied), was the best State Auto could do for her under the policy.

Further, the changing of adjusters, although perhaps annoying to an insured who wants to get her claim settled, cannot be blamed for the result in this case. At no time did

19

plaintiff supply either of the adjusters[11] with the information that they both told her (through her son) that they needed.

Although there were two adjusters assigned to the claim, the amount of time that passed before a final offer was made was attributable as much to the fact that the adjusters were waiting for the Vargos to supply the necessary information as it was to any delay that may have been caused by miscommunication regarding what Mrs. Vargo needed to submit. There is no dispute that Arter supplied Vargo with a contents inventory form and that Vargo gave the form to the company that was assisting him with his mother's claim, but the company chose to use its own form. There is also no dispute that the form itself was not the issue. Arter agreed that he could have worked with any form provided it contained the information regarding ages of the lost items and their original costs. (Arter Dep. at 18.) Even Ms. Butts did not require any specific form; she worked as best she could with what had been provided. The only thing she insisted on was that the Ohio Fraud Warning form be signed and submitted. (Butts Dep. at 38-39.) The simple fact is that State Auto was never provided with information to permit anything but the actual cost calculation that was ultimately made by Ms. Butts. In addition, State Auto was never supplied with any information that would have permitted a replacement cost payment. Finally, State Auto did not receive the inventory it needed to adjust the claim until a little more than two months before the statute of limitations ran and then it acted as quickly as it could, given what it received.

Defendant is entitled to summary judgment in its favor on plaintiff's punitive damages claim.

---

[11] The very first adjuster, Puster, did not have the claim long enough to really be considered for this analysis. Only the second and third adjusters, Arter and Ms. Butts, are relevant to this inquiry and both of them told Vargo that, in order to give replacement costs, they needed proof of replacement. That information was never supplied.

## IV. CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment (Doc.

No. 27) is **GRANTED**.



**IT IS SO ORDERED**.


Dated: January 5, 2011

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

21